would call it claimant I.D. versus BP. Morning, your honors. May it please the court. Jason Joy for J.D. Contractors LLC, the appellant. The issue before this case is a simple, straightforward issue of contract interpretation as applied to the relevant facts which are not in dispute in this case. It has been, however, complicated by a red herring that we call dormancy. But, briefly, J.D. Contractors LLC was incorporated in 2004 and it's been in continuous existence since then. In 2009, in December of 2009, the LLC generated $1.1 billion in revenue. As a residential home builder, however, a first four months of 2010 suddenly dried up. Then, of course, the Deepwater Horizon catastrophe commenced on April 20th, 2010. And, as a result, this Lafayette, Louisiana, Zone C bell claimant was unable to generate any revenues at all following that in 2010. The fallout from this bill lasted well into 2011, although the compensation period for bell claimants— Your Honor, the appeal panel denied your claim solely on the basis that the claim, that the evidence that was not forthcoming to support the claim. Is that correct? Yes, Your Honor. Okay. Or tell me why they were wrong. Well, they were wrong, Your Honor, because they applied an interpretation of the settlement agreement that was contrary to the terms of the court itself. What is that? Well, for business economic loss claimants, the documentation requirements are set forth in Exhibit 4A for business economic loss claimants. Okay, but how did they violate it with respect to you? Why are you entitled to relief? Well, Your Honor, they, the claims administrator denied the claim, which was upheld by the appeal panel on the basis that this was the cryptic explanation that we received, that the specific requirements for eligibility as a member of the settlement class, as laid out in Section 1.2 and 1.3 of the settlement, have not been satisfied as the claimant has not provided specific documentation indicating it was doing business or operating in the Gulf Coast areas at the time of the oil spill, April 20, 2010. Now, that standard— Who said that? This was the claims administrator, Your Honor. Okay, but the appeals count as the decision that is before this court, correct? Yes, sir. And the appeal decision did not, did not decide it on the articulated basis that you just provided, did it? The appeals panel, I thought, said, claiming on, basically on the grounds that you didn't, that they had made numerous efforts on their part to get you to support your claim with evidence and it was not forthcoming. Yes, Your Honor. They were accepting the interpretation that was applied, apparently, by the district court, so, or excuse me, the settlement program. So the appeal panel upheld that interpretation. However, the— Well, I mean, as I read the briefs, it seemed unquestionable that you did not furnish information that was requested. And I'm not saying whether that was right or wrong or whether you had justification for it or not. But why didn't you? What is your justification for not complying with their evidentiary requests? Well, first of all, Your Honor, we disagree with the evidentiary requests that they were asking. They were asking those, for that information, because they were interpreting the settlement to require affirmative evidence beyond what was actually required in the settlement agreement, Your Honor. Okay, so— Okay, well, then that gets, that gets to the ultimate question, then. What section of the It misapplied the entire business economic loss framework, Your Honor. In how? Tell me exactly how. The appeal panel decision? Yeah. Well, the appeal panel decision, again, it's upholding the interpretation that the claims administrator— What is that? I want you, I want you to tell me exactly what your, what your claim is. How? Not just generally, but what is your claim? Your Honor, the— How did they— J.D. contractors provided all the documents that were required in Exhibit 4A. Those are the muffin profit law statements. What did they ask, ask you to supply that you did not supply that was wrong for them to even ask you about? Well, there, what I, we assume, what everything points to, that they're asking us to provide is documents showing that we were expending some minimal level of economic activity on the first day of a five-month-long oil spill, which is not the standard that should be used, Your Honor. The class period in this case for business and economic loss claims is from April 20, 2010 to April 16, 2012. What a business claimant was or was not doing on the first day of a five-month-long oil spill in a class period that's nearly two years is irrelevant, Your Honor. BP even concedes in their brief that— Okay, so that's your claim, that they asked for irrelevant information. That's correct. They're, they're misapplying the settlement, Your Honor, and we believe that— They're asking for evidence that was not applicable to your claim. That's correct, Your Honor. And the evidence that they are asking that's not applicable to your claim relates to the five-month period? Is that what you're saying? Well, they're, from what it appears in the, in the reconsiderations that I'll notice and everything that we've seen is that they're requiring us to provide evidence of class membership beyond that, that's required in the settlement agreement. In what sense? Well, they're requiring us to show some minimal level of economic activity on the first day of the spill, and that's just not, that's just not required, Your Honor. All we need to provide are the monthly profit and loss statements for the relevant period. Here it was 2009 to 2011, as well as federal tax returns showing that we were in the Gulf Coast areas at that time. Section 1.2 are the geographic descriptions, Your Honor, that says entities doing business or operating in the Gulf Coast areas, that, and then 1.2.2 are service businesses with one or more full-time employees, including owner-operators such as our client, JAD LLC, who perform their full-time services while physically present in the Gulf Coast areas at any time from April 20th, 2010 to April 16th, 2012. The claims administrator and the appeal panel adopted an interpretation that requires us to be, you know, doing business or operating at a certain level on April 20th, 2010. And they're completely dismissing the next two ideas, Your Honor. And then additionally, under Section 1.3, which was mentioned here, those are the damage categories. 1.3 is entities who meet the geographic descriptions of Section 1.2, which I just discussed above, are included in the economic class only if their claims meet the descriptions of one or more of the damages categories described below. The following are summaries of the damages categories, which are fully described in the attached exhibits, which here is a business economic loss claim that that would be Exhibit 4. And economic loss category, loss of income, earnings and profits by entities as a result of the Deepwater Horizon incident, which is a defined term, subject to certain exclusions on Exhibits 16 through 19. The class definition exclusions are set forth in Exhibit 18 and are based on the substantive nature of the business. Nothing in the settlement, Exhibits 16 through 19 or anywhere else in the 1,200-page record, mentions dormancy. Whether or not a business qualifies for compensation, it's based on whether or not you were in the Gulf Coast areas during the relevant period and whether or not you meet those damages categories. But you're not claiming that you were entitled to benefits while you were dormant, is that correct? What we're saying is dormant is irrelevant, Your Honor. That's some sort of subjective, vague and nebulous term. But you would have to say you would have to show the loss in order to make a claim, would you not? Whether or not you can make a claim as a class member, whether or not you qualify are two separate distinct things, Your Honor. Are you entitled to anything even if you are not doing business? Even if you have no business, are you entitled to make a claim for a period of time in which you have no income of any kind? Whether or not the business, the business either exists or it doesn't, Your Honor. So if a business doesn't exist, it's not going to have multi-profit law statements So you're claiming, if you use the term dormant, meaning that you're not engaged in any kind of commercial activity during a particular period, you're entitled to be compensated at that time without a showing that your loss is on account of the spill? Your Honor, whether or not the loss is due to the spill, that's based entirely, this is determined exclusively by the terms of Exhibit 4B. Those are the objective, data-driven tests that determine whether or not your revenue patterns meet what was previously agreed upon by the parties and fiercely negotiated 1200 page report over many months, that if your revenue patterns meet a certain, say in this case, V-shaped pattern, when it meets those thresholds, then it is conclusively presumed that all revenue lost during the benchmark period is because of the oil spill. And in this case, we had the $1.1 million in December of 2009, and there was no revenue in the first four months of 2010. The settlement specifically addresses that in Step 2 compensation, Your Honor. If you were doing better in the first four months of 2010, up to the spill, and then When was the spill? The spill was April 20th, 2010 to September 19th, 2010, when the relief well was finally capped. Now, the benchmark period, or excuse me, the compensation period for business economic loss claimants runs from May 1st, 2010 to December 31st, 2010. So even if, as in this case, the damages resulting from the spill clearly continued well into the next year, into 2011, for example, my client had to take odd jobs in May and June of 2011 simply to survive. I mean, all the building jobs in that area were just gone. Nobody was spending any money. There was a lot of... You did have to show at some point the income that you had before the spill, did you not? Yes, that's based on the monthly profit loss statement. So in this case, we provided monthly P&Ls for 2009, 2010, and 2011. And if the administrator would have subjected those monthly P&Ls to the analysis required, the objective analysis required by Exhibit 4B, they would have determined that they meet those thresholds and are therefore eligible for compensation, which is calculated under Exhibit 4C through Exhibit 4E. What was your total income as reflected on these profit and loss statements for the year 2009? It was well over a million dollars, Your Honor. There was $1.1 million in December 2009 alone. And because the panel or the calculations to the formula they used required you to have income and a profit for the first five months before the spill in April, is that somehow your claim? Is that...? No, Your Honor. I mean, whether or not the business economic loss claimant... The current Economic and Property Damages Settlement Program followed from the GCCF, which, as you may recall, was put in place by BP immediately after the spill. And that entire program run by Mr. Feinberg was done away with. And as BP's counsel explained in response to the now famous hypothetical posed by Mr. Accounting Firm in Zone B, that one of the partners went out on medical leave shortly before the spill. And because he was out on medical leave, the profits of the firm basically dried up. And then after the benchmark period in early 2011, he came back from sick leave. For the purposes of the hypothetical, it's assumed that the spill had nothing whatsoever to do with the drop in revenue. However, the firm's profit loss statements met the V-shaped compensation, or met the V-shaped causation patterns, and they were therefore eligible to recover compensation. And the hypothetical was, under these circumstances, are they able to recover, even though that the spill had nothing to do with the losses? And BP's attorney, Mr. Mark Holstein, replied, yes. If the accurate financial data established that the claimant satisfies the bell causation requirement, then all losses calculated in accord with Exhibit 4C are presumed to be attributable to the oil spill. Nothing in the causation framework or compensation framework provides for an offset where the claimant's firm's revenue decline and recovery, if applicable, satisfies the causation test, but extraneous non-financial data indicate that the decline was attributable to a factor wholly unrelated to the oil spill. Such false positives are an inevitable concomitant of an objective qualitative database test. What does Section 1.2 provide regarding doing business at any point in time? Yes, ma'am. Section 1.2, those are simply the geographic descriptions. Doing business or operating in the Gulf Coast areas at the time. And how is doing business or operating defined? It's not, Your Honor. It just says doing business or operating in the Gulf Coast areas, you know, at any time. Isn't that the crux of this, of whether the claimant was doing business or operating and who defines that? Yes, Your Honor. The doing business or operating standard appears to be, and I'll address this in my rebuttal, from a wavered policy that we believe for start-up business claims. Time is up, Your Honor. Why don't you give him some money? I'll explain momentarily. Good morning. May it please the Court. My name is Robert Leiter, and I represent the appellee's VP here. So this appeal arises from the District Court's decision to deny discretionary review over a JAD contractor's business economic loss claim. Over the past four years, this Court has repeatedly held that the District Court is under no general obligation to exercise discretionary review. This Court has only identified two sets of cases where the District Court might have used that discretion. First, if the claimant raises a recurring issue on which the appeal panels are split. Isn't that the case here? With respect, no, Your Honor. There is no split in the appeal panels. So the appeal panels have consistently applied a flexible test to determine whether a business was, whether a claimant was doing business or operating at the time of this bill. So most easily, of course, a business that's earning revenue around April 2010 will be doing business or operating. But there isn't an absolute requirement, as my friend on the other side said, of revenue. So if a claimant has an unusual slowdown, the appeal panel will also look to evidence of expenses. So a lot of these cases come up in the landlord context. So a landlord that's maintaining its premises in a ready-to-lease condition, is actively searching for a tenant, and is advertising, is generally held to be doing business or operating at the time of this bill. In contrast, a business that shows no activity, like JAD did here, no advertising, no bidding, no attempt to secure any business, is held not to be doing business or operating. He says the question of dormancy or not is irrelevant in that it doesn't fit within the language, you know, of the agreement. You know, helpful, but he says his client doesn't have to show as long as they're showing, I guess, the lights are on or, you know, whatever. It's not, quote, shut down. In that sense, whether or not there's any activity, he says, is irrelevant to the determination in that here, the determination is at odds with how that standard has been applied. So we respectfully disagree. I mean, first of all, there was no evidence the lights were even turned on here. I mean, his expenses on that end showed zero. Second, I think my friend on the other side confuses the causation question with preliminary questions of class membership. So Section 1.3 of the agreement defines the economic damages category as a loss of income earnings or profits. And a dormant business, by definition, has no loss of income earnings or profits, and so it wouldn't fit within the class. Similarly, Section 1.2 requires doing business or operating. And, you know, a JAD contractor here was not doing business or operating around the time of the spill. And that doing business or operating is textually separate from the four categories that comes below that thing. Did they bring evidence of the jobs that they say cratered or disappeared? No, Your Honor. And I think that's a prime reason why this claim was denied, that they never supplied any evidence that they had said bid on a job and that job disappeared. What about his example of an individual who becomes ill for the first three or four months in 2010, had a million dollars of revenue for 2009, and then along comes a spill? How do you respond to that? So I think there are two separate questions that deserve separate treatment. First of all, there's the question of whether the business is doing business or operating. And there are a lot of businesses that will remain in operation even as the sole proprietor becomes ill. So those businesses are still going to pay expenses. They're still going to have the cost of an ongoing concern. There's a second question of whether… They may not. I think that would be a very unusual case. I mean, it costs money to run a business. And it's hard to just shut down on a dime where you have no fixed expenses. Not if you're a house painter. I'm sorry? Not if you're a house painter. I mean, I still think there would be costs related. A house painter still probably would have advertisements ongoing. There would still probably be advertisements posted. There are going to be costs related to, say, doing businesses, tax returns and the like. So I think that there are… He's still going to have to maintain insurance and his business licenses. So I do think there are costs that a house painter even would face as an ongoing concern. I think the second issue, which is what was being addressed in the letter that my friend on the other side cites, was questions of causation. And this does not involve causation at all. So the essence of causation is whether certain facts trigger a certain result. In this case, whether the spill caused an economic loss. And the requirement to be doing business or operating isn't a causation standard at all. A business that is doing business or operating might suffer losses as a result of the spill. But it might suffer losses for reasons that are totally unrelated. What the doing business or operating requirement gets to is a threshold requirement of class membership that a business which is not… a claimant which is not doing business or operating could not have suffered the relevant kind of injury that would bring the claimant within the class. But we don't even think you need to get to the merits-based questions here. This court should just affirm the denial of discretionary review. So this court has articulated two sets of cases in which the district court might abuse its discretion denying discretionary review. First is where the claimant raises the recurring issue in which the appeal panels are split and resolution of the question will substantially impact the administration of the agreement. And second, if the appeal panel's decision contradicts or misapplies the settlement agreement or has the clear potential to do so. So as I mentioned a moment ago, this case does not fall within the split on appeal panels. In fact, the appeal panel decisions are remarkably uniform here. So if you go through the seven appeal panel cases, the appeal panels have denied claims where, for example, the business tax return said that it was no business activity in current year, where a landlord had no revenue and incurred no more than de minimis expenses, and where a window cleaning business, incorporated in 1999, recorded no revenue from August 2009 through August 2011 because the proprietor was working for another business. And in contrast, the appeal panels have approved claims where the landlord did not have an immediate tenant but continued to pay for upkeep and advertising costs. And so even though they had no revenue, they had evidence that they were doing business and operating. And similarly, where a real estate agent had no revenue because the nature of his business was sporadic large deals, but where he could show evidence that he had advertised the most recent deal, which had failed. So any of these appeal panel decisions would have denied JAD's claim. JAD's own tax reconciliation, 2010 tax reconciliation, showed no profits and no losses throughout 2010. And this wasn't just after the spill in April 2010. This began all the way in January of 2010. And similarly, the profit loss statement showed no revenue and it showed no expenses that were consistent with an ongoing business. There was no evidence that JAD was advertising. There was no evidence that they were bidding on projects and not getting them. It just shows a complete shutdown of the business throughout 2010. JAD performed its last construction job in December 2009 and it remained dormant all the way until May 2011. Does it have a brick-and-mortar building? I'm not sure, Your Honor. They do list an address. I tried finding the address and I'm not... They list electrical bills, anything? No, Your Honor. There's no evidence that there was rent or utility payments during this time. There's really no evidence that it was... Phone bills, nothing? I'm sorry, Your Honor? Phone bills? No, Your Honor. What evidence did they furnish? They furnished evidence that they had paid insurance policies, although the appeal panel decision found that those insurance policies were for policies that covered 2008 and 2009. They showed some evidence that they had maintained their corporate form, so they were paying for a business license. But as far as I recall, that's basically it. And there's some miscellaneous items in the profit and loss statements that appear to be items that were incurred in previous years but simply recorded in 2010. But there's no evidence that they earned any revenue in 2010, which is pretty extraordinary because even a business that slows down as a result of the spill would probably have some revenue of some kind. And similarly, there's no sets of expenses that are rent, utilities, phone bills, the kinds of things that even if the business had a temporary hiatus, say because the proprietor got sick, that you would expect to continue to be paid. Now, JAD also cannot show that the appeal panel's decision contradicts or misapplies the settlement agreement or has the clear potential to do so. So when reviewing a denial of discretion... How important do they say? What is their argument in that respect? As you understand it. As I understand it, their argument is that the settlement agreement does not require anywhere that the business be operating at the time of the spill. But I think that highlights why this court should affirm the denial of discretionary review. I mean, you would concede that point, would you? I mean, that there's no requirement as such for them to show that they were operating at the time of the spill? So we concede that the settlement agreement does not say in so many words that they were doing business or operating at the time of the spill. That's true. But we think there are two things that are important here. First, that it's a reasonable inference both from Section 1.3, which requires the loss of income, earnings, or profits. In a dormant business, of course, it doesn't have any income, earnings, or profits to lose. And second, we think that doing business at the time of the spill is also an appropriate interpretation of Section 1.2's requirement to be doing business or operating. Now, it's true Section 1.2 doesn't provide for an explicit time period in the initial doing business or operating, but no other time period is consistent with the spill. I mean, did they set out, in particular, the basis of their claim itself monetarily? I mean, why they were... We're asking for X dollars. That claim is supported by this, this, and this? So the only way that the claim is supported is if they're entitled in their revenue statements to put zero dollars rather than N.A. for not applicable. Because our argument is that they're putting zero dollars in the period after the spill and before the spill because they're not doing business or operating at all, not because they're doing business and operating and failing to get businesses. So they will meet the V-shaped test, but they only meet the V-shaped test if they're entitled to put zero dollars into the formula. And that's what we dispute is appropriate here. We think a business that isn't even trying to earn revenue, isn't an ongoing concern, isn't entitled to put zero dollars into the formula. Your basic argument, I suppose, is that this is really not reviewable by this court. Our threshold argument is that this isn't reviewable by this court. I think the most important thing to note here is that section 1.2 doesn't explicitly deny the settlement program's requirement to be doing business or operating at the time of the spill. And this court has held that when you review the denial of discretionary review, this court applies a deferential standard and asks whether the appeal panel's decision is incongruent with the tax. This court has been adamant that the district court is not under any obligation to review individual decisions, even those that raise claims about the proper interpretation of the settlement agreement. And so no matter whether you think we're right or wrong on the doing business or operating, the fact remains that there's nothing in the settlement agreement that explicitly contradicts that. And so for that fact that there's no split in the appeal panels, this court should affirm the denial of discretionary review. So you're saying that doing business provision in 1.2 has been consistently construed one way or the other by the panels? That's correct, Your Honor. And you can read the seven decisions they cite in the opening brief. They're all getting at the same thing, which is has the business shown revenue? And if it hasn't shown revenue, has it shown expenses to indicate that it was functioning? None of the decisions has ever held that legal existence is enough. This court, in somewhat analogous context, has also not accepted that mere legal existence is enough. So in February, this court ruled on a claim by Artsy Enterprises, LLC, which challenged the amount that it was awarded under the settlement program. And Artsy argued that it should have been classified as a failed business rather than as a business. The distinction between the two is whether they commenced operations on or after November 1, 2008. Now, based on conflicting evidence, this court described Artsy's actual date of operations as a moving target, but critically the court did not take judicial notice of when Artsy was formed and held that that was independently sufficient to be doing business or to be operating under the settlement agreement. So both the settlement program and the previous decisions of this court have understood operation to mean something more than legal existence. This court also decided a case back in June, which we cite in our Rule 28J letter, where the doing business or operating framework was at question. Now, it is true in that case the parties didn't challenge the legal interpretation of what doing business or operating meant, but this court was also silent and accepted the idea that doing business or operating meant something more than legal existence. And again, we think this case begins and ends in the denial of discretionary review and that would be an odd omission if this court thought that the requirement to be doing business or operating was somehow incongruent with the plain text of the settlement agreement. If this court has no further questions, thank you. Your Honors, it appears that BP has conceded all relevant points on class membership. The class period is from April 20, 2010 to April 16, 2012. As BP concedes, we have at least revenue in May and June of 2011. Therefore, by their definition, operating, that is within the class period, that's the end of the story. In this case, our particular client is a residential home builder. He didn't have projects. Excuse me, Your Honor? Nothing. Were there any expenses at all? Yes, ma'am, there were expenses. There were some paying... And that you showed all this to the panel? Yes, ma'am. It's within the profit and loss statements. They weren't huge expenses. They weren't expenses generated by doing COGS or anything like that, but they were in continuous existence. What were the expenses? I believe they were paying for insurance. There was some, I think, tax preparation bills, things like that. Our client is an owner-operator, and it says specifically in... Section 1.2.2, service businesses with full-time employees, including owner-operators who perform their full-time services while physically present in the Gulf Coast areas at any time between April 20, 2010 and April 16, 2012. Even if this Court's going to introduce a new dormancy standard, which it's unclear what that is and if that would be consistent with the objective database requirements of this settlement program that was specifically intended to do away with the subjective and inherited inconsistencies with the GCCF that replaced it, even with that standard, we still qualify under the plain language of the settlement. What was the size and composition of your client's business? They were a residential homebuilder, Your Honor. Whenever my client would get a job, he would go out and hire laborers to do those jobs. So it was just... He was an owner-operator. Yes, sir. A solo business? Yes, sir. It wasn't a solo proprietorship. It was an LLC, but they filed the tax returns as a Schedule C to my client's personal tax returns. So for the kind of work they did, I mean, it would sort of outsource the other... Yes, sir. And so it's not... Exactly, Your Honor. So it's not inconsistent at all with the type of business that it is. And certainly in a situation immediately, you know, in the home crisis, the first four months of 2010, then of course the devastation wrought by the Deepwater Horizon disaster... Did he bid on any projects or advertise? From what I understand, there were no projects to bid upon. He had some projects that were supposed to solidify in the first four months of 2010, and all the real estate developers backed away. Banks stopped lending. Then of course the spill came on top of that, so it was a double whammy. And this is a particular claimant that was devastated by the spill, Your Honors. On the pre-spill from January to April... Yes, ma'am. January to April, there were projects that he thought he had, and then they just didn't materialize. Banks weren't lending, the real estate developers... Did he show documentation of why he thought he had those deals, and they fell through? No, ma'am. And we didn't think that any of that was even relevant because it's just based on the requirements of the settlement program. But I think one thing that's, because my time's winding down, I think what's extremely important for this panel to understand is that... What is the loss? Sir? What is the loss? I mean... The loss is that which is calculated in accordance with... Okay, well, what is the ballpark loss? Oh, right around $200,000, Your Honor. And there's one minute left. I'd like to make this... And that's kind of articulated as what actual or anticipated business that he had or would have realized during the time frame? That's in accordance with the compensation framework that the parties agreed to because our client provided the P&Ls. They passed causation under 4B and in Exhibit 4C those P&Ls are subjected to a number of other objective database tests and that calculates compensation. But what I think goes to the point BP here, that this is some garden variety case that doesn't warrant review. We could not disagree any more than I believe we put this in the 28J letter that was submitted yesterday. All of a sudden, the case was brought out in this court and the district court back in 2013 and 2014 and was put to bed. Finally, in the Rule 79 non-profit panel decisions, BP has again started re-urging those same arguments. I don't understand. If the panels are so familiar with all this and Judge Barbier, how did this happen? Well, Your Honor, and my time is up, but we believe that this was put forth via sort of mission creep through Policy 362, which applies to startup business economic loss claims. Policy 362 interjects some totality of the circumstances test to determine whether or not a startup business was doing business or operating on the first day of the oil spill. Now, whether or not, this is a business economic loss claim, not a startup claim, but whether or not a business was doing business or operating, you either have P&Ls or you do not. This is simply an alternate causation test that BP is trying to get in through the back door, Your Honors, and with the hundreds of cases already reported right now, worth hundreds of millions of dollars, if this Court were to rule in favor of BP's position, positions that as we mentioned many times in our briefing, they are judicially stopped from advancing. But the only issue before us is whether the discretionary view below fits into one of the categories. We're not going to be opining about the efficacy of the P&Ls. That's not what we have. I mean, I hear your argument and we understand you passionately have it on behalf of your client, but the settlement agreement and the essence and who they pay and who they not is really not before us. We get lots of these cases in which their appeal. I think we understand the argument you're making as to what you said. You didn't have to provide what was irrelevant, et cetera. We'll sort it out. All right. Thank you, sir. Counsel on both sides, that concludes the arguments for this morning. The panel will stay in a recess until 9 a.m. tomorrow.